[Cite as *In re A.I.H.*, 2024-Ohio-4483.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.I.H. | : | |
| | : | Nos. 112999, 113000, |
| | : | and 113110 |
| A Minor Child | : | |
| | : | |
| [Appeal by P.H., mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART AND REVERSED IN PART
**RELEASED AND JOURNALIZED:** September 12, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. PR-11715019

***Appearances:***

Stafford Law Co., L.P.A., and Kelley R. Tauring, *for appellant*.

Zashin Law, LLC, Kyleigh A. Weinfurtner, Douglas R. Henry, and Morgan E. Helgreen, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} P.H., the mother of A.I.H. ("Mother"), appeals the juvenile court's decisions granting B.G.'s ("Father") motion to modify custody, Father's petition for a writ of habeas corpus, and the guardian ad litem's ("GAL") motion for GAL fees.

After reviewing the facts of the case and the pertinent law, we affirm the juvenile court's decision in part and reverse in part.

## I. Facts and Procedural History

{¶ 2} A.I.H. was born on July 10, 2011. The court journalized an entry delineating Mother's and Father's parental rights and responsibilities on August 16, 2012. That entry designated Mother as A.I.H.'s residential parent and legal custodian.

{¶ 3} Pertinent to the present appeal, Father filed a motion to modify custody or in the alternative motion to modify parenting time ("Motion to Modify") on March 9, 2020. The court held a preliminary hearing on Father's Motion to Modify on October 7, 2020, followed by other proceedings on October 1, 2021.

{¶ 4} The same day he filed his Motion to Modify, Father filed a motion for psychological and custody evaluation pursuant to Civ.R. 35, which the juvenile court granted on September 9, 2021. In granting the motion, the court referred the matter to Dr. Farshid Afsarifard ("Dr. Afsarifard") to perform the evaluation.

{¶ 5} On March 23, 2022, Mother's counsel filed a motion to withdraw as counsel, arguing that Mother had discharged him. The juvenile court denied the motion to withdraw on August 3, 2022.

{¶ 6} A final pretrial was held on March 25, 2022, at which time the trial was continued to August 4, 2022, for completion of a custody-evaluation report. A second final pretrial was scheduled to be held on October 5, 2022.

{¶ 7} A journal entry dated October 13, 2022, set the hearing on Father's Motion to Modify for January 25, 2023. On January 20, 2023, Mother, pro se, filed a motion to continue because she was "without legal representation." The juvenile court denied Mother's motion to continue on January 23, 2023.

{¶ 8} The case proceeded to a hearing, as scheduled, on January 25, 2023. Mother did not appear. Mother's counsel, who had previously moved to withdraw as counsel, appeared and orally renewed his motion, which the juvenile court granted. At the conclusion of the first day of testimony, the court scheduled the matter to resume on January 27, 2023. In a January 27, 2023 journal entry, the juvenile court memorialized that on that date, Mother appeared without counsel and explained that she had not received her client file, had not been able to review Dr. Afsarifard's report, and wished to call witnesses. The court continued the hearing to March 9, 2023. Mother appeared at the reconvened hearing with new counsel.

{¶ 9} Following the hearing, the court granted Father's Motion to Modify and designated Father as the residential parent and legal custodian of A.I.H.

{¶ 10} Father filed a petition for a writ of habeas corpus on June 28, 2023, arguing Mother was unlawfully withholding A.I.H. from him. The court granted Father's petition and issued a writ of habeas corpus, ordering that A.I.H. "is required to leave [M]other's premises for return to the care of the father over any objection of the child or mother." The writ further authorized the Parma Police Department to assist Father in securing possession of A.I.H.

{¶ 11} A.I.H.'s GAL filed a motion for GAL fees that the juvenile court granted, awarding the GAL $7,899.50 in fees for services rendered on the case.

{¶ 12} Mother appeals from the juvenile court's journal entries granting Father's motion to modify custody, issuing a writ of habeas corpus, and awarding GAL fees, raising the following five assignments of error on appeal:

[1] The trial court erred as a matter of law and abused its discretion by denying [Mother's] Motion for Continuance and depriving her of cross-examination of the custody evaluator.

[2] The trial court erred as a matter of law and abused its discretion by admitting the Report and Recommendation of Farshid Afsarifard, Ph.d., into evidence.

[3] The trial court erred as a matter of law and abused its discretion by granting [Father's] Motion to Modify Parenting time and Motion to Modify Residential and Custodial Parent under Ohio Revised Code Section 3109.04.

[4] The trial court erred as a matter of law and abused its discretion by issuing a Writ of Habeas Corpus.

[5] The trial court erred as a matter of law by awarding the GAL attorney fees and litigation expenses pending [Mother's] appeal of June 16, 2023 Journal Entry.

## II. Hearing Testimony

{¶ 13} At the hearing held on January 25, 2023, and concluding on March 9, 2023, the following testimony and documentary evidence was adduced.

### A. Dr. Afsarifard

{¶ 14} Dr. Afsarifard testified regarding the custody evaluation he performed pursuant to the juvenile court's September 9, 2021 order. In that custody evaluation, Dr. Afsarifard explained that

[he] followed the standards set by the American Psychological Association for these types of evaluations which involves evaluating both parents, and that evaluation includes interviews, clinical interviews, behavioral observations, some psychological testing.

{¶ 15} Dr. Afsarifard used two formats for testing, "the MMPI, the Minnesota Multiphasic Personality Inventory, the Second Edition [and] used the Millon Multiaxial Inventory, the Fourth Edition." In addition, Dr. Afsarifard "observed the child with each parent and interviewed the child" in addition to speaking with "any collateral sources of information, stepparents or other people that the parents suggest that [he] speak with[.]" After conducting these tests and reviewing any pertinent documentation, Dr. Afsarifard summarized his findings in a report. Dr. Afsarifard's report was admitted into evidence.

{¶ 16} During Dr. Afsarifard's interview with Mother as part of his custody evaluation, Mother reported that A.I.H. "had a lot of anxiety because of spending time with her father and she was scared, and she didn't want to have as much parenting time." A.I.H.'s current therapist, Dr. Rizner, informed Dr. Afsarifard that A.I.H. "was adjusting well and that things were going well" with Father's visitation. A.I.H. reported to her therapist that she missed Mother during visits with Father and "had some anxiety, but when specifically asked about the anxiety, it was about thunderstorms . . . ." Further, A.I.H. expressed that she felt more comfortable at her Mother's house because she was permitted to sleep in bed with Mother when she felt scared. A.I.H. was not permitted to do so at Father's house. Dr. Afsarifard explained that at 11 years old, he would not consider it appropriate for A.I.H. to sleep in bed

with Father and that Mother allowing it to happen at her home could set an expectation for A.I.H. when she sought comfort.

{¶ 17} A.I.H.'s former therapist, Dr. Jack Brunner, informed Dr. Afsarifard that Mother brought A.I.H. in because of anxiety that she experienced about visiting Father. However, according to Dr. Afsarifard, Dr. Brunner concluded after a few appointments that A.I.H. did not experience anxiety related to visiting Father, contrary to Mother's assertions. However, Dr. Afsarifard explained that A.I.H. did "have some tendencies towards anxiety" and would benefit from therapy.

{¶ 18} Dr. Afsarifard explained that based on his evaluation, he was most concerned with what he called the "therapy interfering part of [A.I.H.'s] worksheet." He explained that A.I.H. had seen "a couple of counselors" and he "gathered from Dr. Brunner, [that Mother] would bring [A.I.H. in] with a certain agenda and if later on with [F]ather's involvement that agenda was dissolved, [Mother] would pull her out of the therapy." "The therapists would quickly realize that they were caught in a custody situation that most therapists don't want to be involved in and that was really interfering with [A.I.H.] getting good treatment."

{¶ 19} Mother also reported to Dr. Afsarifard that A.I.H.'s "grades were suffering, but when [Dr. Afsarifard] asked for more detail, she had a couple of bad grades on a couple of tests, but continued to be on the Honor Roll . . . ." During his evaluation, Mother raised concerns with Dr. Afsarifard about Father's anger and the fact that A.I.H. was scared as a result. However, "all of the concerns [Mother] raised were from a long time ago, ten years ago." Despite Mother's reported concerns, Dr.

Afsarifard had no safety concerns with A.I.H. and Father. Dr. Afsarifard explained that this was because A.I.H. never reported feeling fearful towards Father to him or to her therapists. For example, when A.I.H. was asked during visits with both Mother and Father if there was ever a situation where she felt uncomfortable or that someone hurt her, she answered no.

{¶ 20} When Dr. Afsarifard administered the MMPI II to Mother, "[s]he approached the test in a much more guarded manner" than the average parent in a custody evaluation. Dr. Afsarifard observed that Mother had difficulty managing her feelings, was more reactive than most people, and had difficulty building and maintaining long-term relationships. Dr. Afsarifard learned that Mother had "a strong reluctance to allow [Father] to participate in any kind of parenting activities or have visitation" with A.I.H. This reluctance seemed motivated by infidelity and other problems the parents had during their relationship.

{¶ 21} Dr. Afsarifard found that Father was "also guarded" when he administered the MMPI II to him. However, Father was "in the same range as most parents in these evaluations . . . ." As a result of the MMPI II, Dr. Afsarifard found that Father had issues storing his negative emotions, which led to episodic outbursts and reported alcohol and marijuana use, "but none of the addiction-related scales were elevated." Father demonstrated a tendency to be good at making relationships but had difficulty in maintaining them.

{¶ 22} Father "acknowledged having some problems with managing his anger effectively early on" to Dr. Afsarifard. Father was "frustrated with [the] lack

of cooperation and not being included in decision-making" for A.I.H. Dr. Afsarifard learned that Father had engaged in anger management, and was "working on some of those issues."

{¶ 23} In addition to A.I.H., Father has a son and a stepdaughter. Mother has no other children. Dr. Afsarifard believed that A.I.H. gets adequate attention in both homes.

{¶ 24} After observing A.I.H. and Father together, Dr. Afsarifard recalled that they had a normal parent-child relationship and did not notice any problems with the way they interacted. Similarly, Dr. Afsarifard did not see any problems with the way Mother and A.I.H. interacted after observing them together. Dr. Afsarifard acknowledged that A.I.H. was "more animated" when she came in with Mother, however he did not attribute that to A.I.H. being anxious in Father's presence; rather, he believed it was because it was her second time in the office and children are less nervous after the first visit.

{¶ 25} A.I.H.'s interview with Dr. Afsarifard revealed that she was a normal child for her age, however "[s]he was clearly caught in the conflict between her parents. She was very much aware of it." She had "no specific complaints" about the time she spent with Father, but appeared "really careful not to say anything positive" about her time with Father. Dr. Afsarifard interpreted that as A.I.H. feeling the need to take a side in her parents' conflict. A.I.H. seemed to have a closer relationship with Mother than Father, but Dr. Afsarifard attributed that to "time, proximity, being a girl and . . . having 100 percent of her mother's attention" when

at Mother's home. A.I.H. expressed a desire to spend less time with Father, and Dr. Afsarifard believed that was "mostly her opinion."

{¶ 26} As a result of Dr. Afsarifard's custody evaluation, he recommended that parenting time be split evenly between Mother and Father. A.I.H. "was connected to both of" her parents. Regarding a custody recommendation, Dr. Afsarifard stated that he typically likes to "start from the position of shared parenting" however,

> [i]n high-conflict situations that seems to just perpetuate the problem and research supports that as well, so for not having any other option, you have to pick one parent to make those ultimate decisions. Once they are not able to reach an agreement, somebody has to make decisions and until that point the mother had been the one who made these decisions, and from everything that I saw she had a poor track record of involving the father.

Based on the conflict between the parents and Dr. Afsarifard's concern regarding therapy interference, Dr. Afsarifard recommended that both Mother and Father be involved in decision making for A.I.H., but Father should have the final say. Regarding therapy, Dr. Afsarifard recommended that A.I.H. continue to see her current therapist, Dr. Rizner, and the parents see someone "to be on the same page . . . to lower [A.I.H.'s] stress and anxiety, but also give her the kind of structure that makes her feel comfortable. . . ." Dr. Afsarifard explained that his recommendations were based on what he believed were in A.I.H.'s best interests.

## B. Father

{¶ 27} Father testified that he filed the motion to modify custody for several reasons. According to him, he wanted the visitation he and Mother agreed to that

he claimed he was not getting. Furthermore, he wanted to have a part in the decision making for A.I.H.

{¶ 28} Father stated that his decision-making power had been "slim to none." For example, Father claimed he never had a say in any of the counselors or doctors A.I.H. has seen; they were chosen either by Mother or the court. When Father would attempt to schedule appointments with one of A.I.H.'s counselors, Mother would "deny him access" because "she's the custodial parent and she's gonna schedule appointments . . . ."

{¶ 29} Father explained that during a weekend visit, A.I.H. did not feel well and had a fever of 100.3 degrees. He stated he gave her medicine and allowed her to relax all day. The next morning, she still did not feel well, so Father brought her to a clinic near his home, and informed Mother. Mother showed up upset and wanted to bring A.I.H. to another clinic. Father claimed he did not challenge Mother because he did not want to fight and allowed Mother to take A.I.H. to the other clinic.

{¶ 30} Regarding visitation, Father explained that under the current parenting order, he was supposed to have visitation with A.I.H. Tuesdays, Thursdays, and every other weekend. The weekend visitation was ordered to be overnight. However, Father claimed that Mother did not allow him any overnight visitation in 2019 or 2020. In 2021, Father began having his overnight visitation following an October 2021 pretrial. Father stated that there were instances after October 2021 where he had been denied parenting time by Mother.

{¶ 31} Father recalled that A.I.H. exhibited some anxiety getting into his car for the first overnight in October 2021. However, as they drove home her body language and demeanor changed and she started talking to Father about school. Since then, A.I.H. has progressed and according to Father, no longer exhibits any anxiety when she goes to his house for visits.

{¶ 32} Father described A.I.H.'s relationship with his family. His mother is her "grammie" and A.I.H. occasionally has overnights at her house during his parenting time. A.I.H. is "very close" with her half-brother and "friendly" with her stepsister. Father's cousin lives nearby and has two daughters with whom A.I.H. spends time.

{¶ 33} Father explained that his work schedule provides him with a lot of "flexibility." His job allows him to work hybrid which enables him to easily get A.I.H. to school at Heritage Christian School and his son to school in Medina. Father lives in Broadview Heights in a four-bedroom house with A.I.H., and his wife, son, and stepdaughter.

{¶ 34} Father believed that he was in the best position to make decisions for A.I.H. because he would consider Mother's opinions as well as A.I.H.'s and make a decisions that are in A.I.H.'s best interest. Father believed he "could provide a healthy, happy, environment for [A.I.H.]" that would include both himself and Mother in her life.

### C. Mother

{¶ 35} Asked whether there were any issues regarding Father's parenting time, Mother stated that there were and that A.I.H. "broke her arm at [Father's] house and he refused her any and all medical treatment." According to Mother, A.I.H. injured her arm playing with stilts at the neighbor's house during Father's parenting time. When she asked A.I.H. about it, she learned that Father put ice on her wrist but did not feel it needed immediate medical attention. This happened approximately one month prior to the hearing.

{¶ 36} Mother later explained that after taking A.I.H. to the hospital, she was put in a splint, diagnosed with a sprain, and recommended to a pediatric orthopedist. Approximately five days later, A.I.H. was seen by the orthopedist, who diagnosed her with a broken scaphoid, a bone in the wrist, and put her in a cast. Mother testified that A.I.H. was in a cast for approximately two weeks. A note from a pediatric orthopedic nurse documenting A.I.H.'s treatment was admitted into evidence.

{¶ 37} Mother also testified regarding the incident where A.I.H. was sick during a weekend visit with Father. According to Mother, Father did not permit A.I.H. to call Mother all day when A.I.H. felt sick despite A.I.H. wanting to do so. A.I.H. was able to call Mother from her stepmother's phone when Father left to go to a basketball game. Mother informed Father at 9:40 p.m. via Our Family Wizard that she made an appointment for the next morning at 10 a.m. for A.I.H. Mother acknowledged that Our Family Wizard demonstrated that Father did not read the

message until 9:45 a.m. the following morning. A.I.H. missed the appointment, and according to Mother, Father made a different appointment for A.I.H. "[a]gainst [their] Court order."

{¶ 38} Mother believed that counseling was good for A.I.H., because A.I.H. "was having a hard time going with" Father.

{¶ 39} Mother recalled that according to A.I.H.'s former therapist, Dr. Brunner, she should encourage A.I.H. to go to her parenting time with Father if A.I.H. was struggling. Mother acknowledged that the relationship with Dr. Brunner terminated because he did not feel therapy was needed.

{¶ 40} Mother stated she is not interested in a shared parenting plan that includes joint decision making with Father. Mother explained that she felt this way because of Father's denial of medical attention for A.I.H., and her belief that he has broken the current plan numerous times. Mother had concerns about how Father would care for A.I.H. if there was a medical emergency.

## D. Grandfather

{¶ 41} Mother's father ("Grandfather") testified that he is close with A.I.H. and sees her frequently.

{¶ 42} According to Grandfather, the night before the hearing A.I.H. told him that when she broke her wrist Father "didn't even care. He kind of made fun of [her] that it was not that serious and he wouldn't even take [her] to the doctor." A.I.H. told Grandfather that Father is mean to her "sometimes."

**E. GAL**

{¶ 43} The GAL recommended that Father's motion to modify custody be granted despite A.I.H. consistently expressing a desire to stay with Mother. He believed there was "a significant change of circumstances" by way of "the degradation of the relationship" between Father and A.I.H. As a result, Father "should take all the leading roles" regarding decision making for A.I.H.

{¶ 44} The GAL noted that he was "compelled" by Dr. Afsarifard's report and also believed Mother engaged in counselor shopping. However, he was "unsure" about Dr. Afsarifard's recommendation that Mother and Father have equal parenting time because the GAL believed Mother and Father will "continue to have their conflicts . . . ."

{¶ 45} The GAL testified that he spoke with the nurse who wrote the note admitted into evidence regarding an injury to A.I.H.'s wrist. The nurse explained to him that the fracture A.I.H. suffered was "a very common[ly] overlooked injury" and not the result of medical neglect.

## III. Law and Analysis

### A. Motion for Continuance

{¶ 46} "The grant[ing] or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge, and an appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *In re X.R.*, 2008-Ohio-1710, ¶ 22 (8th Dist.), citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion "'implies that the court's attitude is

unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). The Ohio Supreme Court recently explained that an abuse of discretion "involves more than a difference of opinion." *State v. Weaver*, 2022-Ohio-4371, ¶ 24. That is, a trial court's judgment that is "profoundly and wholly violative of fact and reason" constitutes an abuse of discretion. *Id.*

{¶ 47} The Ohio Supreme Court identified factors a trial court "should note" when evaluating a motion for continuance:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Unger* at 67-68. Pursuant to Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."

{¶ 48} The record demonstrates the following regarding the *Unger* factors. Mother's motion to continue did not request a specific length of the continuance; rather, Mother merely requested that the hearing be continued.

{¶ 49} Mother's January 20, 2023 motion was her only request for a continuance of the January 25, 2023 hearing date.

{¶ 50} Mother filed her motion to continue just five days before the hearing was scheduled. The hearing was set approximately three months prior to Mother's motion.

{¶ 51} Mother's stated reason for requesting the continuance was that she was without legal representation. Mother attached an affidavit to her motion in which she stated that "through no[] fault of her own [she] is currently unrepresented by counsel and need[s] an attorney in order to proceed to Trial . . . ." As noted, Mother's attorney filed a motion to withdraw on March 23, 2022, stating that Mother had discharged him. While Mother's reason for requesting a continuance was because she was without counsel, this statement ignores the fact that, although the motion to withdraw was denied, Mother had been effectively without counsel for approximately ten months at the time she filed her motion.

{¶ 52} Furthermore, when the court asked the parties about Mother's motion for continuance at the hearing on Father's Motion to Modify, A.I.H.'s GAL addressed the court and stated that the hearing had previously "been extended a few times and the child needs to have stability and predictability with her future. . . . [T]he Court should definitely move forward with trial to set this child's future."

{¶ 53} Mother's motion was not the result of emergency or unforeseen circumstances. Mother was well aware of her lack of counsel and her failure to timely obtain counsel was not an unforeseen circumstance. This weighs in favor of finding that the request was not for a legitimate reason but was contrived for the purposes of delay and that Mother contributed to the circumstances that she claimed required the continuance.

{¶ 54} Moreover, the court did allow Mother additional time. The hearing began on January 25, 2023. Rather than concluding the proceedings the next

scheduled date of January 27, 2023, the matter proceeded on March 9, 2023, at which time both Mother and her counsel appeared.

{¶ 55} Applying these facts to the *Unger* test and Juv.R. 23, we cannot say that the juvenile court abused its discretion by denying Mother's request for a continuance of the proceedings on January 25, 2023. *See In re C.W.*, 2020-Ohio-3189, ¶ 22 (8th Dist.) ("[T]he record reflects that a continuance would have caused great inconvenience to the agency witness, opposing counsel, the guardian ad litem, and court personnel who were present and ready to proceed with the hearing.").

{¶ 56} Accordingly, Mother's first assignment of error is overruled.

## B. Qualification of an Expert Witness

{¶ 57} In her second assignment of error, Mother argues that "Dr. Afsarifard was not properly qualified as an expert witness at trial" and thus the court erred when it admitted his report into evidence. We disagree.

{¶ 58} Expert witness testimony is governed by Evid.R. 702, which states:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 59} The trial court's decision regarding whether a witness meets the qualifications of Evid.R. 702 to testify as an expert is within the sound discretion of the trial court and will not be reversed on appeal unless it is clearly demonstrated that the court abused its discretion. *JP Morgan Chase Bank v. Stevens*, 2017-Ohio-7165, ¶ 24 (8th Dist.).

{¶ 60} At the hearing, Dr. Afsarifard testified that he is "the Clinical Director and CEO" at Premier Behavioral Health services "and also function[s] as a clinical and forensic psychologist there." As part of his "forensic practice, [Dr. Afsarifard] conduct[s] evaluations based on Court orders" similar to the court order for a child custody evaluation in the present case. Dr. Afsarifard explained that

[a] forensic evaluation is a psychological evaluation done to provide input to Courts regarding different questions that may be raised in different situations. . . . In civil cases, mostly child custody evaluations, it's questions about allocation of parental rights and responsibilities, parental fitness and those types of issues.

{¶ 61} Dr. Afsarifard further testified that he received his "Ph.D. in clinical psychology from the Fielding Institute in Santa Barbara." One of Dr. Afsarifard's focuses in his practice is "child, adolescent and family issues[.]" As part of his practice, Dr. Afsarifard developed a family component of an Adolescent Intensive

Outpatient program "where families come for three hours every other week to learn specific skills that have to do with emotion regulation, distress tolerance, being mindful and personal effectiveness so that they can coach their children who are in the same program in using those skills."

{¶ 62} After this testimony, and the identification of his curriculum vitae that was admitted into evidence, the court asked whether there were "[a]ny objection[s] on the qualifications of Dr. A[fsarifard] as being competent and sufficiently educated to testify in the matters that were referred to him?" There were no objections.

{¶ 63} This court has recognized that the trial court does not err in permitting a witness to provide expert testimony simply because magic words do not appear in the record when qualifying the witness as expert. *State v. Powell*, 2023-Ohio-2770, ¶ 86 (8th Dist.), citing *State v. Primeau*, 2012-Ohio-5172, ¶ 58 (8th Dist.). Here, Dr. Afsarifard testified regarding his specialized knowledge, skill, experience, training, and education regarding family and custody issues. Therefore, we do not find that the court abused its discretion when it permitted Dr. Afsarifard to testify as a witness and admitted his report into evidence.

{¶ 64} Mother's second assignment of error is overruled.

## C. Custody Modification

{¶ 65} "Decisions in child custody matters are among 'the most difficult and agonizing decisions a trial judge must make.'" *In re G.B.*, 2022-Ohio-382, ¶ 64 (8th Dist.), quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "Therefore, a trial

judge must have wide latitude in considering all the evidence before him or her . . . and such a decision must not be reversed absent an abuse of discretion." *Davis* at 418. "The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Id.* An abuse of discretion "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore*, 5 Ohio St.3d at 219, quoting *Adams*, 62 Ohio St.2d at 157.

{¶ 66} In support of her third assignment of error, Mother argues that the juvenile court's journal entry modifying custody "simply recites the statutory factors of [R.C.] 3109.04 to justify depriving [Mother] of her parental rights and responsibilities" and that those factors are not supported by the record. We disagree.

{¶ 67} Pertinent to this appeal, R.C. 3109.04(E)(1)(a) provides:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

. . .

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

**{¶ 68}** "It is beyond question that a custodial parent's interference with visitation by a noncustodial parent may be considered a change of circumstances that would allow for a modification of custody." *In re S.M.T.*, 2012-Ohio-1745, ¶ 7 (8th Dist.), citing *C.G. v. C.L.,* 2008-Ohio-3135, ¶ 13 (8th Dist.). In *S.M.T.,* this court addressed a custody dispute involving a mother who attempted to harm the child's relationship with the child's father and interfered with the father's visitation rights. This court upheld a finding of changed circumstances even though the court did not expressly state that there was a change of circumstances.

**{¶ 69}** Here, the court expressly found that "a change in circumstances has occurred in the child's life, the child's residential parent, and that a modification is necessary to serve the best interests of the child." The court's June 16, 2023 journal entry did not "simply recite" the statutory factors as argued by Mother. In its June 16, 2023 journal entry, the juvenile court provided a thorough review of the testimony provided by the custody evaluator, Dr. Afsarifard. Citing *S.M.T.*, the juvenile court found that Mother repeatedly "interfered or denied father his parental rights as ordered by the court; that mother's misconduct relates to her acts of misrepresentation or misleading others to obstruct or interfere with the child's relationship with her father, that this detrimental behavior shows no signs of abating; and is therefore contrary to the child's best interests."

**{¶ 70}** Further, the court found the "harm likely to be caused by a change of environment is outweighed by the advantages of the change in environment to" A.I.H. In its journal entry, the court stated that it considered "the child's and parents' available time including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedules." In addition, the court explained in the journal entry that it took into account A.I.H.'s interaction with her parents, siblings, and family members; age; wishes; adjustment to her home, school, and community; health and safety; the location of Mother's and Father's residences; the parties' mental and physical health; Mother's and Father's wishes; willingness to reschedule missed parenting time and cooperate; and, the recommendation of the GAL.

**{¶ 71}** Furthermore, we do not find that the juvenile court abused its discretion when it granted Father's Motion to Modify because its findings are supported by evidence in the record. Father filed his Motion to Modify on March 9, 2020, along with an affidavit in which he averred, among other things, that "since August 11, 2019 Mother has refused Father all parenting time . . . ." As noted in the June 16, 2023 journal entry, during the pendency of Father's Motion to Modify, the court altered the parenting schedule in preliminary rulings, increasing Father's time with A.I.H. In its June 16, 2023 journal entry, the juvenile court noted that the custody evaluator indicated that the increased time with Father was going well for A.I.H.

{¶ 72} The court heard testimony that Mother and Father have struggled with communication and that Father has missed parenting time with A.I.H. as a result. Dr. Afsarifard explained that Mother has engaged various therapists for A.I.H. attempting to establish that visitation with Father produced anxiety in A.I.H. Father had not been involved in establishing those relationships. Dr. Afsarifard reported that at least one of those therapists discontinued the relationship because, in his professional opinion, A.I.H. did not need treatment.

{¶ 73} Dr. Afsarifard explained that because it had been Mother making the decisions, he recommended a change so that Father would be the ultimate decision-maker in an attempt to make parenting less contentious. The court heard that while A.I.H. expressed a desire to spend more time with Mother, her relationship with Father was strong and that A.I.H.'s desires may be motivated by a feeling that she is stuck in the middle of her parents' feud. Father expressed a willingness to include Mother in decision making while Mother was not interested in a plan that gave Father decision-making authority due to her belief that he denied A.I.H. necessary medical care.

{¶ 74} Like Dr. Afsarifard, the GAL recommended modifying custody. The GAL noted he observed a significant change in circumstances as a result of Mother's conduct and that it would be in A.I.H.'s best interest to grant Father's motion.

{¶ 75} Based on the record before us, we cannot say that the juvenile court abused its discretion when it granted Father's motion and modified custody. Mother's third assignment of error is overruled.

### D. Writ of Habeas Corpus

{¶ 76} Mother argues in her fourth assignment of error that the juvenile court erred when it granted Father's petition for a writ of habeas corpus. We agree.

{¶ 77} R.C. 2151.23(A)(3) provides a juvenile court with jurisdiction to hear and decide a petition for writ of habeas corpus involving the custody of a child. The Ohio Supreme Court has explained that "[i]n a child-custody action, a writ of habeas corpus will be granted only if the petitioner establishes that '(1) the child is being unlawfully detained, and (2) the petitioner has the superior legal right to custody of the child.'" *Lee v. Weir*, 2016-Ohio-8104, ¶ 9, quoting *Holloway v. Clermont Cty. Dept. of Human Servs.*, 80 Ohio St.3d 128, 130 (1997). In a child-custody action, "[h]abeas corpus relief is the exception rather than the general rule." *Id.*

{¶ 78} "[G]enerally nonjurisdictional challenges preclude the issuance of a writ of habeas corpus." *B.R.K. v. Goldberg*, 2022-Ohio-1243, ¶ 6 (8th Dist.). This pronouncement flows from the Supreme Court of Ohio's recognition that "'[a] writ of habeas corpus will lie in child custody matters if the custody order in dispute was entered by a court without jurisdiction, thus being void *ab initio*.'" (Emphasis in original.) *Howard v. Catholic Social Servs.*, 70 Ohio St.3d 141, 143-144 (1994), quoting *Beard v. Williams Cty. Dept. of Social Serv.*, 12 Ohio St.3d 40, 41 (1984). However, the Court also recognized that when only nonjurisdictional claims are raised, under unusual and extraordinary circumstances, a writ of habeas corpus will lie where there is no other adequate remedy at law. *Id.* at 144.

{¶ 79} The corollary to this is that a writ of habeas corpus is not proper "'when there is an adequate remedy in the ordinary course of law.'" *In re G.T.B.*, 2011-Ohio-1789, ¶ 8, quoting *In re Complaint for Writ of Habeas Corpus for Goeller*, 2004-Ohio-5579, ¶ 6. *See also State ex rel. Speweik v. Stierwalt*, 2023-Ohio-1470, ¶ 18 (6th Dist.). "[T]o be an adequate remedy at law, the remedy must be 'complete, beneficial, and speedy.'" *State ex rel. Durrani v. Ruehlman*, 2016-Ohio-7740, ¶ 16, quoting *State ex rel. Ullmann v. Hayes*, 2004-Ohio-5469, ¶ 8. A show-cause motion or motion for contempt constitutes an adequate remedy at law to force compliance with a shared parenting order. *Tierney v. Tierney*, 2008-Ohio-2755, ¶ 24 (11th Dist.); *In re Pollis*, 1997 Ohio App. LEXIS 4029, *2 (11th Dist. Sept. 5, 1997); *Bailey v. Cook*, 1986 Ohio App. LEXIS 5445, *4-5 (5th Dist. Jan. 29, 1986).

{¶ 80} The juvenile court's June 16, 2023 journal entry modifying custody designated Father the sole residential parent and legal custodian of A.I.H. The entry further granted both Mother and Father the right to make medical decisions for A.I.H., but granted Father final say should a disagreement arise. Further, the Mother and Father were given a "2-2-5-5" visitation schedule.

{¶ 81} In addition to modifying custody, the court found Mother in contempt of the previous custody agreement. The court sentenced Mother to "30 days in county jail and a $250.00 fine." Mother could "purge her contempt by providing [F]ather with the following additional exclusive parenting time from Friday, June 16, 2023 at 3:00 p.m. until July 7, 2023 at 3:00 p.m." Father

established that he had a superior legal right pursuant to the June 16, 2023 entry to custody of A.I.H. and that Mother was unlawfully withholding A.I.H. from Father in contravention of that right. In Father's affidavit attached to his petition for a writ of habeas corpus, Father averred that following the juvenile court's June 16, 2023 order modifying custody, Mother had "completely cut off all contact between Father and" A.I.H. Father attempted to contact Mother via phone and Our Family Wizard to no avail. Mother also failed to respond to communication from Father's attorney regarding Father's visitation with A.I.H. Further, Father averred that Mother failed to appear on June 16-18, 2023, to effectuate Father's time with A.I.H.

{¶ 82} However, the contempt proceedings that were ongoing in this case demonstrate that Father had and was pursuing an available remedy at law to provide the relief he was seeking. Generally, a court's contempt powers provide an adequate remedy at law for the enforcement of a shared parenting plan or custody order. *Tierney*, 2008-Ohio-2755, at ¶ 24 (11th Dist.); *Williams v. Williams*, 2002-Ohio-4224, ¶ 5-6 (11th Dist.). In the vast majority of nonjurisdictional cases, this will preclude reaching for the extraordinary remedy of a writ of habeas corpus.

{¶ 83} In fact, along with the petition for writ of habeas corpus, Father simultaneously filed a motion to order into execution the contempt sanctions that the juvenile court threatened in its June 16, 2023 contempt order. There was no ruling on that motion prior to the juvenile court granting the writ of habeas corpus. By filing both at the same time, father essentially acknowledges that either could accomplish his goal of obtaining physical custody of the child. Father's petition did

not address whether the ongoing contempt proceedings constitute an adequate remedy at law. The petition is silent on this point. In Father's brief to this court, he argues that he was without an adequate remedy at law but does not address why the ongoing contempt proceedings were inadequate when the result Father obtained could have been obtained in the contempt proceeding. *See Williams* at ¶ 6. Father did not demonstrate to the juvenile court or this court that no other adequate remedy at law existed. Father was pursuing that adequate remedy through the contempt proceedings and his motion to impose sentence. This means extraordinary relief in habeas corpus was not available and the trial court erred in issuing the writ in this case.

{¶ 84} Mother's fourth assignment of error is sustained.

### E. GAL Fees

{¶ 85} In her fifth, and final, assignment of error, Mother argues that the court erred when it awarded the GAL fees while the present appeal was pending. In doing so, Mother argues that the juvenile court was divested of jurisdiction to grant the GAL's fees while the case was before this court.

{¶ 86} "'[O]nce an appeal is perfected, the trial court is divested of jurisdiction over matters that are inconsistent with the reviewing court's jurisdiction to reverse, modify, or affirm the judgment.'" *State ex rel. Electronic Classroom of Tomorrow v. Cuyahoga Cty. Court of Common Pleas*, 2011-Ohio-626, ¶ 13, quoting *State ex rel. Rock v. School Emps. Retirement Bd.*, 2002-Ohio-3957, ¶ 8.

{¶ 87} Mother has not demonstrated that the trial court's award of GAL fees was inconsistent with the matters on appeal. In fact, Mother raised no other assignment of error related to the GAL or the fees requested. "If the determination of costs [or fees] is not directly related to the area or issues on appeal, a trial court's award of costs [or fees] pending appeal is not improper or without jurisdiction." *J&H Reinforcing v. Ohio School Facilities Comm.*, 2014-Ohio-1963, ¶ 12 (10th Dist.). Therefore, the juvenile court's entry awarding GAL fees is not inconsistent with the issues on appeal. Thus, the juvenile court did not err when it awarded the GAL fees and Mother's fifth assignment of error is overruled.

{¶ 88} Judgment affirmed in part and reversed in part. The judgments of the juvenile court are affirmed with the exception of the juvenile court's judgment granting a writ of habeas corpus, which is reversed.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR